Filed 11/20/25  In re Erick J. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re Erick J., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | E085696 |
| Plaintiff and Respondent, | (Super.Ct.No. DLRI2400019) |
| v. | OPINION |
| ERICK J., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mark E. Petersen, Judge.
Affirmed.

Lizabeth Weis, under appointment by the Court of Appeal, for Defendant and
Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney
General, Arlene A. Sevidal, Assistant Attorney General, Christopher P. Beesley and
Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

1

The People filed a juvenile wardship petition alleging that Erick J. committed one count of murder (Pen. Code, § 187, subd. (a)), one count of robbery (Pen. Code, § 211), and one count of attempted robbery (Pen. Code, §§ 664, 211). Erick appeals from the juvenile court's order transferring him to adult criminal court under Welfare and Institutions Code section 707. (Unlabeled statutory references are to this code.) He argues that the record does not contain substantial evidence supporting the transfer order. We affirm.

LEGAL FRAMEWORK

"Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court. It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' (§ 707, subd. (a)(1).) The prosecution bears the burden of proving that the minor should be transferred. (Cal. Rules of Court, rule 5.770(a).)" (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*).)

After the People move to transfer the minor, "the juvenile court shall order the probation officer to submit a report on the behavioral patterns and social history of the minor." (§ 707, subd. (a)(1).) "Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor

2

is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).)

The court must consider five criteria when deciding whether the minor is amenable to rehabilitation under juvenile court jurisdiction. (§ 707, subd. (a)(3)(A)-(E).) "Those criteria are (1) 'the degree of criminal sophistication exhibited by the minor' (§ 707, subd. (a)(3)(A)(i)), (2) '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' (§ 707(a)(3)(B)(i)), (3) '[t]he minor's previous delinquent history' (§ 707, subd. (a)(3)(C)(i)), (4) '[s]uccess of previous attempts by the juvenile court to rehabilitate the minor' (§ 707, subd. (a)(3)(D)(i)), and (5) '[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor' (§ 707, subd.(a)(3)(E)(i)). The statute sets forth a nonexhaustive list of relevant factors for the court to consider with respect to each of the five criteria. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)"[1] (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.)

---

[1] The listed relevant factors for the five criteria are: "the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication" (§ 707, subd. (a)(3)(A)(ii) [the degree of criminal sophistication]); "the minor's potential to grow and mature" (*id.*, subd. (a)(3)(B)(ii) [possibility of rehabilitation within the time remaining of juvenile court jurisdiction]); "the seriousness of the minor's previous delinquent history and the effect of the minor's

*[footnote continued on next page]*

3

BACKGROUND

I.    *The alleged offenses*[2]

On the morning of January 7, 2024, Erick took his mother's car without permission and drove with his associate, Enrique P., to 52-year-old L.F.'s home in response to a post on the OfferUp website listing a used iPhone for sale. Erick did not have a driver's license. L.F. reported that when Erick and Enrique arrived, they stayed in the car and "asked [L.F.] to see the phone." L.F. handed Enrique the phone, and Erick "sped off." L.F.'s arm was stuck in the open window, and "[s]he grabbed onto the window frame." Her husband yelled at her to let go, and she did. "She complained of back pain following the incident."

That afternoon, Erick and Enrique drove to meet with J.S. about purchasing a used iPhone that she had listed on OfferUp. When they arrived, she directed the vehicle toward the curb, and J.S. "leaned into the passenger window." Erick "accelerated at a high rate of speed with J.S. still on the passenger window." J.S. hung on to the car and was thrown from the vehicle. She landed on the asphalt and suffered major head trauma,

---

family and community environment and childhood trauma on the minor's previous delinquent behavior" (*id.*, subd. (a)(3)(C)(ii) [previous delinquent history]); "the adequacy of the services previously provided to address the minor's needs" (*id.*, subd. (a)(3)(D)(ii) [previous juvenile court attempts to rehabilitate]); and "the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development" (*id.*, subd. (a)(3)(E)(ii) [circumstances and gravity of the alleged offense]).

[2]    We take the facts of the alleged offenses from the probation report.

"a compound fracture, and injuries consistent with being struck by a vehicle." She was rendered unconscious and was taken to the hospital. The fire department had to wash down the street because of "the large amount of blood left on the roadway." J.S.'s injuries required a craniectomy to save her life. For approximately one week, "J.S. remained unconscious, intubated, and medically sedated." She was declared brain dead, and the following week, she was taken off life support. She died shortly thereafter.

A few hours after their encounter with J.S., Erick and Enrique went to 51-year-old R.N.'s home. R.N. reported that they "arrived at her home to buy a cell phone she posted for sale on OfferUp." She reported that "she and her husband went outside together," and Erick and Enrique would not get out of the car. R.N. and her husband told them that "they needed to exit the vehicle if they wanted to buy the phone." "Erick and Enrique asked to see the phone to 'see if it worked.'" R.N. and her husband thought that they were "acting suspiciously and told them to leave."

The probation officer reported that "there were at least three additional victims in San Bernardino County and other OfferUp accounts in Ontario, Colton, and Corona had provided their addresses; however, it was unknown at the time if these other individuals were also victimized."

During the investigation, law enforcement searched Erick's cell phone. Law enforcement found that Enrique had sent "multiple OfferUp ads and addresses to" Erick's phone. Law enforcement also discovered that Erick's phone "was present in the area of the incident locations." Law enforcement discovered a video on Erick's phone with him

"bragging about an iPhone 14 which he displayed and appeared to match the one stolen in Highland." Another video showed "Erick claiming, 'South Side Verdugo Flats Giovanna Street'" and saying "'if you mess with me, you get deceased.'"

When law enforcement searched Erick's mother's car, they found "one unspent nine millimeter bullet (located on the driver side floorboard); a digital scale; a container with marijuana inside (also located on the floorboard of the driver's side); an ashtray; and two Apple brand phones (located in the glove box)."

On January 18, 2025, Erick was arrested for "Possession of a Firearm; Carrying a loaded Firearm on Person or Vehicle in Public; Hit and Run; Evading a Peace Officer While driving in the Opposite Direction of Traffic; and Reckless Evading," which were alleged to have taken place on January 15, 2024. Erick was then "transferred to Riverside County Juvenile Hall on February 15, 2024, on charges of Murder, Robbery, and Attempted Robbery."

II. *The petition and the probation report*

The People filed a juvenile wardship petition alleging that Erick committed one count of murder (Pen. Code, § 187, subd. (a)), one count of robbery (Pen. Code, § 211), and one count of attempted robbery (Pen. Code, §§ 664, 211). The People also moved to transfer Erick to criminal court the same day.

In March 2024, the probation department filed a report pursuant to subdivision (a)(1) of section 707 recommending that Erick be transferred to criminal court. The report described Erick's personal history and included statements from his parents.

6

Erick had several tattoos, including an "'F' and 'F'" tattoo "positioned upside down next to each other on [his] right hand." Erick told the probation officer that the tattoo "mean[t] 'forever faithful' and denie[d] it [was] gang related." Erick denied any gang affiliation, and when he was asked again about the "'F' and 'F'" tattoo, Erick told the probation officer that it had religious significance and meant "'Family First.'" When the probation officer interviewed Enrique's mother, she said that she suspected Erick was in the process of becoming a gang member in "Verdugo Flats," because he had gotten the "'FF'" tattoo on his hand which meant "'Forever Flats.'"

Erick was a senior in high school at Options for Youth. He had passed all 10 of his classes, and he had no disciplinary referrals. Before transferring to Options for Youth, he carried a 1.79 grade point average. He reported that he enjoyed Options for Youth because "he was able to be with his friends." He also reported that he wanted to become an electrician. Erick's parents reported that before transferring to Options for Youth, he felt isolated because his friends had transferred there. His friends were known to be "positive influences," so Erick's parents agreed to transfer him.

Erick reported that he had consumed alcohol on five occasions while at family gatherings. He drank beer and "shots" with cousins and without his parents' knowledge, and he reported that he had "never consumed alcohol to the point of inebriation." He also reported that he first smoked marijuana when he was 15 years old, and he had been smoking "four to five 'joints'" per week since turning 16. He said that he smokes marijuana to relax and not to "self-medicate." When his mother found out that he had

7

been smoking marijuana, his parents "counseled [him] against drug use, restricted him to the home for some weeks, and confiscated his electronics."

Erick told the probation officer that his older brother struggled with drug use. The probation officer reported that "[a]fter seeing how addiction affected his brother and the rest of his family, [Erick] had no interest in doing any drugs. While he previously excused his marijuana use, his time in detention has allowed him to reflect on how it prevented him from spending quality time with his family and all the money he wasted on smoking marijuana. He does not intend to continue his marijuana usage."

Erick reported that he was in good mental health aside from "sometimes feeling anxious and restless due to having a lot of energy." He denied "any history of self harm, violence towards others, fire starting, or hurting animals." He reported no history of trauma. Erick's parents reported that Erick appeared to suffer from depression when he was six to seven years old, "during the worst part of his older brother's struggles with drugs." They said that Erick is "preoccupied with maintaining a good relationship with his older brother."

The probation officer reported that Erick was adjusting to juvenile hall. Erick said that he felt "safe and cared for," and he was attending "school daily, maintain[ing] positive interactions with his peers, and [being] respectful to staff." He told the social worker that "he would fully cooperate and comply with the Court's orders, including participation in counseling, drug testing, and staying out of trouble with the law." He asked "to remain in Juvenile Court."

8

Erick said that he had "good relationships with his parents," and "[h]e considers them to be his best friends and loves them." The probation officer reported that his parents "have always held [him] accountable when he is doing something wrong by not just counseling him but also providing him consequences." Erick also said that he had a "great" relationship with his sister, and "she is a very good person and a positive role model." Erick "enjoys spending quality time with his entire family, as they go out to eat, cook together, and attend church as a family at least twice a week." He worried about his older brother's "autism, bipolar disorder, and history of substance abuse."

Erick's parents said that they had "loving relationships" with Erick, and "[t]hey still [saw] him as the family baby, as he is the youngest." They said that Erick "maintain[ed] great relationships with his siblings," and he "turns to his sister for advice and encouragement." The probation officer reported that "Erick is preoccupied by his desire to be there for his older brother to maintain communication and encourage his brother in his sobriety," and Erick said that "he must be his older brother's 'big brother.'"

Erick's parents requested that Erick remain in juvenile court. They believed that his good behavior during his detention was "indicative of his true nature." They thought that Erick would take advantage of services, "including counseling for drug use, therapy, continuation of his education, and any other available services."

Erick's parents were surprised when they learned that one of the victims had died, and they became emotional. They "[knew] Erick to be a good person who is kind and loving to his family." They blamed themselves "as the vehicle used in the offenses

belong[ed] to his mother, and his father admitted to teaching him how to drive." "They admit[ted that Erick] took his mother's vehicle without permission on two or three occasions," and "[a]fter these instances, they counseled [him] and provided consequences."

Erick's parents reported that Erick behaves well at home, and he completes his chores. He is loving and takes care of the family dogs. Erick's parents reported that they "approve[d] of [his] friends." His friends had "always been respectful while at their home." They "appear[ed] goal oriented, as they have been able to maintain employment while performing well academically. Their involvement in sports ha[s] also allowed [Erick] to stay motivated and active."

Erick's parents reported that "Erick has never had any issues in his community." His parents were surprised to learn that "the offenses took place in several different locations, including Riverside County," because "they never expected [Erick] to operate a vehicle much less to places that far outside their local community." They also reported that Erick "never required much in terms of discipline. When [he] struggled with school, they attributed any decline to experiencing bullying, isolation, or stress caused by [his] older brother's battle with addiction." They reported that he had "always been respectful of his curfew. They never felt a need to punish him, as he maintained good communication about his whereabouts, associates, and return times."

The probation officer recommended that Erick be transferred to criminal court on the basis of three of the five relevant statutory criteria: Erick's degree of criminal

sophistication, his delinquency history, and the circumstances and gravity of the alleged offenses. (§ 707, subd. (a)(3)(A), (C), (E).) Regarding the remaining statutory criteria—whether the minor can be rehabilitated before the expiration of the juvenile court's jurisdiction and the success of previous attempts by the juvenile court to rehabilitate the minor—the probation officer believed that the criteria did not support transfer. (§ 707, subd. (a)(3)(B), (D).) As to whether Erick could be rehabilitated before the expiration of juvenile court jurisdiction, the probation officer observed that, depending on various circumstances, Erick might remain under juvenile court jurisdiction for "seven years," "seven years or more," "seven and a half years," or "a baseline term of four to seven years." The probation officer then listed various programs that might be available at a secure youth treatment facility and concluded without further explanation that "[u]nder this criterion, Erick appears appropriate to remain under juvenile court jurisdiction." The probation officer also reported that Erick had "no prior history of juvenile adjudications" and that "[g]iven the lack of previous reported delinquent history, as this is Erick's first referral to Probation and petition before the Juvenile Court, the Probation Department has not yet had the opportunity to provide resources to assist in Erick's rehabilitation."

III.    *The transfer hearing*

The People called no witnesses to testify at the contested transfer hearing on January 21, 2025. Defense counsel called Dr. Francesca Lehman, Psy. D., as an expert witness. Lehman testified that to evaluate Erick, she met with him in person, administered tests, and spoke to his relatives. Lehman said that she found "most

11

significant" "the impact of his brother's severe mental illness on the family." She testified that there were also "other factors, including the COVID-19 pandemic."

Lehman testified that Erick had some issues relating to "attention and that there were a number of transitions for school for him until he found the right fit." She said that he complained of "bullying or feeling ostracized," and she "learned that he was doing quite well in juvenile hall."

Lehman also testified that Erick "had a pretty stable social history until the pandemic upended some of his social connections, some friends or family members moved away, and that he became gang involved shortly, I would say—I couldn't say exactly when, but certainly before this offense occurred he started becoming involved with gang members moving away from some of the friends that he had grown up with, though it also seems some of the friends he grew up with also started going down the wrong path." She said that it was "a fairly rapid period of time, started getting gang related tattoos and smoking increasing amounts of marijuana and taking his mother's car without permission and escalating in his delinquency."

Lehman testified that she learned that Erick had no "legal history," and she "found that significant because that means that there were no attempts—previous attempts at intervention."

Lehman testified that with regard to "the degree of criminal sophistication," she "always tr[ied] to convey to the Court that criminal sophistication is not particularly well defined. I don't have an exact definition of how that should be analyzed. The Court—

the legislature provides some guidance about what factors the Court may or shall consider. And some of those factors include family and community and environment, the impact of peer pressure or family issues, developmental factors, mental health factors, but also, in my opinion, it's important to evaluate the sophistication that is exhibited in the offense in question, whether it appears to be a particularly sophisticated type of offense or conduct." She testified that "[i]n this case there's clear evidence that there was planning. The concern that I have is that there was not evidence of forethought and planning about how the events unfolded, about how a robbery can turn into a murder, right. How somebody can die in the course of a robbery, that part was not well considered. So some aspects of this offense are more sophisticated while other aspects seem less sophisticated to me because it requires a degree of forethought and understanding of potential consequences that adolescents are by virtue of their age not well equipped to engage in." Lehman testified that "gang involvement increases criminal sophistication."

Lehman also testified that "the presence of peers when you're an adolescent specifically increases the likelihood that you engage in risky behaviors," and "if you're looking at forethought, the degree of anticipation or understanding of potential risk that would be involved in this offense, to me, decreases the criminal sophistication because it was not his intent, as far as I can tell, to have somebody die." She testified that Erick "was well within that age range that you would expect that his prefrontal cortex was still in the process of developing" and that his "anxiety potentially and some other maybe more nebulous kind of loneliness and social isolation, not feeling that he could express

13

himself in his family and feel supported in the family largely because a lot of their emotional resources had to go to his older brother. [¶] So while not all of those are diagnostic conditions, I think they affected his mental health and contributed to his decisions." Lehman opined that "Erick was not so criminally sophisticated or entrenched in a gang that he couldn't benefit from remaining in juvenile. So I determined that under that criterion he should remain in the juvenile system."

Defense counsel asked whether Erick could be rehabilitated before the expiration of juvenile court jurisdiction. Lehman testified that gang intervention, substance abuse treatment, and family therapy would be important for Erick's rehabilitation. She also testified that "vocational or educational programming" "is one of the strongest services" that probation could provide. She testified that "with the appropriate services," Erick's needs could "be met by the time he is 25 which would be over six years from now." She opined that based on that criterion, he should remain under the juvenile court's jurisdiction.

Lehman testified that "there were no prior arrests, but there was prior delinquency to consider." She considered "that he was violating the rules of his home, smoking marijuana, despite his parents' admonition or attempt to even provide some help for him, that he took his mother's car without permission, that he was not following their rules even after they spoke to him about it." She testified that "in no way does his delinquent history suggest to [her] that he can't benefit from the services available in juvenile court."

14

With regard to any previous attempts at rehabilitation, Lehman testified that although "he's had no previous attempts in the court system," "he's doing extremely well in detention, and he's well-adjusted and doing well, progressing in school." She opined that "[t]o [her] that is a strong indicator that he will continue to be successful."

As to the circumstances and gravity of the offense, Lehman testified that Erick was "an active participant, and the level of harm was maximal." She further testified that what "swayed [her] was the combination of adolescent brain development and the unintended consequences that unfolded." She testified that "even adults can make poor decisions in rapidly unfolding situations, sometimes not even making a decision, reacting a certain way. So if I know that and I understand this was a quickly and rapidly unfolding situation involving adolescents with peers present, what I expect is not good decision-making." She concluded that Erick "should be found amenable, in [her] opinion, to services available within the juvenile court with the time left."

On cross-examination, Lehman testified that Erick did not have "any neurological disorders or significant learning impairment disorders that would affect his ability to understand" "what's going on in terms of reality." She acknowledged that when an individual "decides to get a permanent branding on them[selves]," "that's an indication they're more committed to the gang." She also acknowledged that Erick and Enrique "appear[ed]" "equally engaged in" the offense. She agreed that the crimes in this case, which involved ruses "to get people to come into contact with [Erick] and [Enrique]," showed "more sophistication than a crime of opportunity."

15

Lehman agreed that her opinion would change regarding Erick's ability "to be rehabilitated prior to the [juvenile] [c]ourt losing jurisdiction" if the court "would be limited to just one year or 12 months prior to admitting the petition." She acknowledged that it was possible that Erick had been involved in "criminal behavior" before getting caught. She agreed that it was possible that Erick "could have known [J.S.] was partially inside the vehicle holding onto the cell phone that [Enrique] was hanging onto" and that there were "no facts that were present that [Erick] slowed down the vehicle, stopped the vehicle, or did anything like that." Lehman also acknowledged that three days after J.S. was injured, Erick "was alleged to have been driving another vehicle from another person's mother and that he committed or participated in a robbery of an individual at a gas station." She was aware that Erick had been "detained by the Riverside Police Department with regards to the string of robberies and released," and that "there was a theft from a shoe store that ultimately led to a vehicle chase which ultimately led to a traffic collision and injuring three different people."

On redirect examination, Lehman testified that it was significant that the alleged conduct occurred in a short period of time because there was "a very limited opportunity to provide interventions."

Following the close of evidence, Erick's counsel argued that "the gravity of the offense alone is not sufficient to transfer to adult court." Counsel argued that it "was supposed to be a simple theft which quickly escalated into a robbery which then again escalated into a murder." Counsel contended that Erick "did not intend to kill anybody.

16

There's no evidence he intended to kill somebody. I would argue there's no evidence he intended to hurt anybody. He had no implied malice." Counsel argued that the evidence was not clear whether Erick knew that J.S. was hanging on to the car, "[a]nd because of the tinted windows, I would argue he doesn't really know, and [the People are] just merely speculating."

With respect to criminal sophistication, defense counsel argued that "Erick did not show any sophistication in this crime. It was [Enrique] who disguised himself, who changed his name on the app, who located these victims, who coordinated with them, who set up the meetings. He sent Erick the addresses and Erick merely drove. The crime itself was anything but sophisticated. It was sloppy." Counsel argued that Erick "was merely the getaway driver. He did not disguise himself. He did not hide the car. He did not cover up the license plates. He didn't change his name. He continued to drive the car after all of this occurred. That is not sophisticated. That is immature and that is not thinking about the consequence of his actions."

As to whether Erick could be rehabilitated before the expiration of the juvenile court's jurisdiction, defense counsel argued that the People had not carried their burden of proving that there was insufficient time to rehabilitate Erick. Counsel argued that the People did not present any evidence of Erick's rehabilitative needs, "much less why they could not be met with the juvenile court's jurisdiction." Counsel argued that if the court dismissed the attempted robbery count, Erick would be "eligible for a secure track."

17

Regarding delinquency history, counsel argued that Erick had no prior issues in school and had not previously "been to court for a crime," and the other prior acts described in the probation report, such as alcohol and marijuana use, were "only crimes because he's a minor." Counsel contended that the probation report's claim that Erick lacked remorse about "causing the death of [J.S.] is just incorrect because he didn't know and had no reason to know."

The court took the matter under submission and set a future date to announce its ruling.

IV. *The ruling*

On March 7, 2025, the court issued a written statement of decision and also supplemented it with some additional analysis stated orally on the record. The court ruled that the People had carried their burden of proving by clear and convincing evidence that Erick should be transferred to criminal court. In reaching its decision, the court noted that it considered "the evidence presented by counsel, including the probation officer's report filed March 28, 2024, the initial detention report, filed February 16, 2024, as well as briefs filed by counsel and oral argument by both counsel."

With respect to Erick's degree of criminal sophistication, the court found that the evidence supported a finding that Erick "knew what he was doing, participated willingly, had knowledge of the plan and implementation of the plan." The court found that "[t]here was no evidence of any visual obstruction between the driver and his co-participant minor who was looking at the victim's phone. Absent any evidence of an

18

obstruction or purposeful refusal to look, the minor would certainly have been able to know what was going on. In fact, as part of the plan to steal victims['] phones, the minor would need to know when his co-participant had control of the phone in order for the driver—the minor herein—to begin to drive away as part of the crime. To claim that the minor did not know what was going on, who had possession of the phone or that the victim was still in the area is illogical, unsupported by the evidence and contrary to all logic and reasoning." The court found that "[b]oth [Erick] and his co-participant were working together to carry out the criminal act of stealing phones, so the action and plan was to secure possession of the phone and then drive away," and Erick "had no concern whatsoever for the victim who was handing the phone to the co-participant, in order to decide if it was safe to drive away or wait until the vehicle was clear of any person standing nearby or still holding onto the phone." In addition to the reasons given in the written statement of decision, the court stated at the hearing that Erick's "intentional acts did not occur as a result of an accident or misunderstanding but rather a calculated plan and orchestrated event." For all of those reasons, the court determined that the People had carried their burden of proof on the first criterion.

In analyzing whether Erick could be rehabilitated before the expiration of juvenile court jurisdiction, the court acknowledged the probation officer's apparent conclusion that "seven and a half years of services would be sufficient," but the court also noted that "[i]t is unclear what the probation officer's analysis would be in 2025," roughly one year after the report was issued. The court also noted that, depending on which charges were

19

found true, juvenile court jurisdiction might last "approximately four years or six years" but alternatively "would expire on the minor's 21st birthday if all charges are found true." At this stage of the proceedings, without "hearing from the People and/or the alleged victims in this case," the court did not find it "appropriate" to commit to dismissing a charge "as a means to achieve a particular result or obtain a longer jurisdictional limit for the minor." Given all of those considerations and "the numerous services and programs needed," the court concluded that transfer to criminal court was supported by this criterion.

The court's oral statements when announcing its ruling were similar. The court observed that, "depending upon which crimes were found to be true and also based upon the maximum confinement time the judge would set at a dispositional hearing," "there could be approximately five to six years available for services to the minor," but alternatively there might be "less than three years to provide services." Given Erick's "enormous and substantial needs," the court concluded that "there is simply not enough time for rehabilitative services."

Regarding delinquency history, the court found that Erick "does not have a prior documented, formal delinquent history with the juvenile court prior to the date of the alleged offense in this matter." As a result, the court determined that this criterion weighed in favor of denying the motion to transfer.

Similarly, as to the success of previous attempts by the juvenile court to rehabilitate Erick, the court noted that he had not received any prior probation services.

20

Consequently, this criterion too weighed in favor of keeping Erick under the jurisdiction of the juvenile court.

With respect to the circumstances and the gravity of the offenses, the court found that the "crime involved great violence and great bodily harm and multiple victims were targeted." The court found that given Erick's "conduct and severity of the offense," "[he] should be transferred to a court of criminal jurisdiction."

At the transfer hearing, the court noted that in its written statement of decision, it discussed Lehman's testimony only in its analysis of the first criterion. In its oral ruling, the court clarified that it considered all of her testimony, and the court had concerns about some of it. The court found that credibility was "an issue," and the court gave two examples. First, the court stated that regarding the circumstances and gravity of the offense, Lehman "testified basically that this was a robbery, not a murder, and the expert told me to look at it from the minor's point of view. I found that to be somewhat suspect—I will just be honest with you. This is an expert witness who is testifying as to the criteria that the Court must consider, and the gravity of the offense is not necessarily looked at from the minor's p[er]spective. The gravity of the offense is looked at as to what offense happened, how serious it was, and the cause or the harm that it caused. And it was not just a robbery. It did involve a murder, under Penal Code 187. So I felt that the expert was holding back a little bit." Second, with respect to the degree of criminal sophistication exhibited by the minor, the court noted that "the expert talked about sophistication saying that sophistication is not well defined. I felt again that was a way of

21

trying to get out of defining whether this crime was sophisticated or not. This is an expert witness who has testified, I think, 90 times as an expert, and I just found some of the testimony to be somewhat lacking and not necessar[ily] credible, but, again, I did consider the entire testimony, and I did apply it to all five criteria."

STANDARD OF REVIEW

"We review the juvenile court's ruling on a transfer motion for abuse of discretion." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.) "'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.'" (*Ibid.*) "The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence." (*Ibid.*)

"Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' [Citation.] Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165, quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989,

22

1005.) "In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings." (*Miguel R.*, at p. 165.)

DISCUSSION

I.    *Lehman's testimony*

Erick argues that the court abused its discretion by "reject[ing] Dr. Lehman's expert testimony, finding she was not credible." The argument lacks merit.

First, the court did not categorically reject Lehman's testimony. Rather, the court explained that it "considered every single thing the expert witness testified to." The court merely had "some concerns about some of it" and found "credibility to be an issue in some of the expert's testimony." Thus, Erick's premise that the court simply "rejected Dr. Lehman's expert testimony" is not supported by the record.

Second, """"it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.'"""" (*People v. Alvarez* (2025) 18 Cal.5th 387, 470.) In particular, "the juvenile court was not required to credit the testimony of the defense expert[ ]. As trier of fact, it was free to discredit such testimony." (*In re J.S.* (2024) 105 Cal.App.5th 205, 212.) As a result, "[w]e do not second-guess the trial court's credibility findings." (*People v. Tully* (2012) 54 Cal.4th 952, 984.)[3]

---

[3]    Erick contends that a "trial court's credibility determinations are upheld on appeal if supported by substantial evidence," and he argues that the juvenile court's adverse credibility determination concerning parts of Lehman's testimony is not supported by

*[footnote continued on next page]*

II.    *Substantial evidence challenges*

Erick argues that the record does not contain substantial evidence supporting the court's findings that (1) his degree of criminal sophistication, (2) whether he could be rehabilitated before expiration of the juvenile court jurisdiction, and (3) the circumstances and gravity of the offense each weighed in favor of transferring him to criminal court. We disagree.

With respect to Erick's degree of criminal sophistication, the court found that Erick's "intentional acts did not occur as a result of an accident or misunderstanding but rather a calculated plan and orchestrated event."  The record contains substantial evidence to support that finding.  Erick's cell phone revealed that Enrique had sent "multiple OfferUp ads and addresses" to Erick's phone.  The record also contains evidence that Erick took his mother's car without permission, drove with Enrique to Moreno Valley and Riverside in response to the OfferUp advertisements, and acted in concert with Enrique to steal the phones that were being offered for sale.  Erick's phone also had a video of him

---

substantial evidence and therefore must be rejected.  The argument fails for several reasons.  First, because Erick does not contend that credibility determinations are upheld *only if* supported by substantial evidence, the adverse credibility determination concerning Lehman could be upheld even if it were not supported by substantial evidence.  Second, Erick cites no authority for his unstated premise that adverse credibility determinations are upheld *only if* supported by substantial evidence, and the premise is straightforwardly false.  Credibility determinations are often based on witness demeanor, which cannot be evaluated by an appellate court conducting substantial evidence review.  (See, e.g., *People v. Scott* (2011) 52 Cal.4th 452, 493 ["witness's 'demeanor is always relevant to credibility'"].)  Third, it is well established that determining the credibility of witnesses is "'"the *exclusive* province of the trial judge or jury."'"  (*People v. Barnes* (1986) 42 Cal.3d 284, 303, italics added.)

"bragging about an iPhone 14," which matched the description of one of the phones stolen in San Bernardino County. And during each of the incidents, Erick and Enrique arrived at the victim's home, waited in the car, asked to examine the phone, and sped away once Enrique had control of the phone. It was reasonable for the court to infer that Erick's "actions demonstrate[d] a clear plan with his co-participant to rob individuals of their phones without paying for them," and it was likewise reasonable for the court to find that Erick's degree of criminal sophistication supported a transfer to criminal court.

Erick argues that the court "failed to consider results from Dr. Lehman's testing on the likelihood that Erick has fairly poor judgment, with thought processes likely marked by confusion, indecision, distractibility, and difficulty concentrating." But the court stated at the hearing that it "did consider the entire testimony" and "did apply it to all five criteria." And even if Erick's contention were correct, it would not show that the court's finding was not supported by substantial evidence—a finding can be supported by substantial evidence even if the record also contains evidence that would support a contrary finding. (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) Rather, Erick's argument asks us to reweigh the evidence, which we cannot do on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 355 (*Scott*).)

As to whether the minor could be rehabilitated before the expiration of juvenile court jurisdiction, Erick argues that the juvenile court "failed to give great weight" and "failed to give due weight" to certain portions of Lehman's testimony. The argument fails, because we do not reweigh the evidence. (*Scott*, *supra*, 9 Cal.4th at p. 355.) Erick

also takes issue with the juvenile court's statement that "[f]or the court to dismiss a charge simply to create additional custody time would be an affront to the quest for justice for all parties concerned," arguing that "there is no basis in law or fact for the court's finding that dismissing Erick's non-707(b) offense would be an offense to the quest for justice." The argument is unpersuasive, because the court did not conclude that dismissal of that charge would be an offense to the quest for justice. Rather, the court reasoned that (1) it would be inappropriate at this stage of the proceedings to commit to dismissal of that charge in order to secure a longer period of juvenile court jurisdiction, so (2) the possibility that the charge will not be dismissed, will be sustained, and will cause juvenile court jurisdiction to expire at Erick's 21st birthday is an appropriate factor for the court to consider. The court's reasoning was not arbitrary, capricious, or otherwise contrary to law, and Erick has not shown that the court erred.

And as to the circumstances and gravity of the offense, Erick argues that the "court's analysis did not touch on any of the relevant mitigating factors" and that "Dr. Lehman analyzed all the relevant factors." But again, the court expressly stated that it "considered every single thing this expert witness testified to." Moreover, even Lehman testified that "in terms of the level of participation and the level of harm, I think that's pretty clear he was an active participant, and the level of harm was maximal." Again, we do not reweigh the evidence. (*Scott*, *supra*, 9 Cal.4th at p. 355.) The court's finding that the circumstances and gravity of the offense supported transfer was supported by substantial evidence.

26

Finally, Erick argues that the court's finding that the People had carried their burden of proving by clear and convincing evidence that he is not amenable to treatment is not supported by substantial evidence because each of the court's findings on the criteria weighing in favor of transfer were not supported by substantial evidence. We disagree. As we have already discussed, the record contains substantial evidence supporting the court's findings on the degree of criminal sophistication, whether the minor could be rehabilitated before expiration of the juvenile court's jurisdiction, and the circumstances and gravity of the offense.

For all of the foregoing reasons, we conclude that the record contains substantial evidence supporting the court's findings, and the court therefore did not abuse its discretion by granting the People's transfer motion.

DISPOSITION

The order transferring Erick to criminal court is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ

J.

We concur:

McKINSTER

Acting P. J.

MILLER

J.

27